## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. _____- Civ

UNITED STATES OF AMERICA,

     Plaintiff,

v.

THE MORTGAGE FIRM, INC.,                   JURY DEMAND

     Defendant.

_____

## <u>COMPLAINT</u>

1.     The United States of America (the "United States") brings this action against The Mortgage Firm, Inc. ("The Mortgage Firm") under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-3619, the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-1691f, and ECOA's implementing regulation (Regulation B), 12 C.F.R. pt. 1002, to remedy discrimination in The Mortgage Firm's residential mortgage lending.

2.     The FHA and ECOA prohibit all creditors from discriminating in home loans on the basis of race, color, national origin, and other characteristics.

3.     "Redlining" is one type of discrimination prohibited under the FHA and ECOA. Redlining occurs when lenders discourage loan applications, deny equal access to home loans and other credit services, or avoid providing home loans and other credit services to neighborhoods based on the race, color, or national origin of the residents of those neighborhoods.

4.     From at least 2016 through 2021 (the "Relevant Time Period"), The Mortgage Firm engaged in a pattern or practice of unlawful redlining. As alleged in detail below, The Mortgage

1

Firm avoided providing home loans[1] and other mortgage services in majority-Black and Hispanic[2] neighborhoods and high-Black and Hispanic[3] neighborhoods in the Miami-Fort Lauderdale-Pompano Beach, Florida Metropolitan Statistical Area ("Miami MSA").

5.     Throughout the Relevant Time Period, The Mortgage Firm's redlining practices included locating and maintaining nearly all its Miami MSA offices and its loan officers in majority-white neighborhoods and avoiding having offices in—or having loan officers serve—majority- and high-Black and Hispanic areas. This is despite the fact that 64% of the residential census tracts in the Miami MSA are majority-Black and Hispanic and 36% are high-Black and Hispanic. The Mortgage Firm also concentrated its outreach in majority-white neighborhoods and failed to conduct outreach, marketing, and advertising of mortgage services to majority- and high-Black and Hispanic areas, including by failing to train or incentivize its loan officers to compensate for its lack of offices in majority- and high-Black and Hispanic areas.

6.     As a result of these practices, The Mortgage Firm generated disproportionately low numbers of mortgage loan applications and home loans during each year in the Relevant Time Period from majority- and high-Black and Hispanic neighborhoods in the Miami MSA, as compared to similarly situated lenders.

---

[1] For purposes of this Complaint, the terms "mortgage loans" or "home loans" refer to all loans that The Mortgage Firm and other creditors must report under the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. §§ 2801-2810, and "mortgage lending" refers to providing those loans.

[2] A majority-Black and Hispanic census tract is a census tract for which the United States Census Bureau has identified more than 50 percent of the residents as either "Black or African American" or "Hispanic or Latino." This Complaint uses "majority-Black and Hispanic census tract," "majority-Black and Hispanic area," and "majority-Black and Hispanic neighborhood" interchangeably and does the same for "majority-white census tract," "majority-white area," and "majority-white neighborhood."

[3] A high-Black and Hispanic census tract is a census tract for which the United States Census Bureau has identified more than 80 percent of the residents as either "Black or African American" or "Hispanic or Latino."

2

7.      The Mortgage Firm's conduct and practices were intended to deny, and had the effect of denying, equal access to home loans for those residing in, or seeking credit for properties located in, majority- and high-Black and Hispanic neighborhoods, and discriminated against, including by discouraging, applicants and prospective applicants from applying for home loans on the basis of the race, color, and national origin of the residents of those neighborhoods.

8.      The Mortgage Firm's conduct was not justified by a legitimate, non-discriminatory reason or business necessity and was not necessary to achieve a substantial, legitimate, non-discriminatory interest.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction over this action because it presents a federal question, 28 U.S.C. § 1331, is brought under federal laws, 42 U.S.C. § 3614(a), and 15 U.S.C. § 1691e(h), and is brought by the United States, 28 U.S.C. § 1345.

10.      Venue is proper in this Court under 28 U.S.C. § 1391 and 12 U.S.C. § 5564(f), because The Mortgage Firm conducts business in, and a substantial part of the events or omissions giving rise to the claims occurred in, this District.

## PARTIES

11.      The United States brings this action to enforce the FHA and ECOA. The FHA and ECOA authorize the Attorney General to bring a civil action in federal district court whenever he has reason to believe that an entity is engaged in a pattern or practice of resistance to the full enjoyment of rights secured by the FHA and ECOA. 42 U.S.C. § 3614(a); 15 U.S.C. § 1691e(h). The FHA further authorizes the Attorney General to bring suit where the defendant has denied rights to a group of persons and that denial raises an issue of general public importance. 42 U.S.C. § 3614(a).

3

12.     The Mortgage Firm is a mortgage company, or a non-depository institution, incorporated in Florida since 1995, with offices across Florida and the Southeastern United States. As of the filing of this Complaint, The Mortgage Firm is licensed to originate mortgage loans in 18 states.

13.     The Mortgage Firm is an S-Corporation with no parent company, subsidiaries, or affiliates. Several of The Mortgage Firm's offices operate under aliases, but the aliases are not separate legal entities or subsidiaries of The Mortgage Firm.[4]

14.     From 2016 through 2021, The Mortgage Firm originated mortgage loans secured by one- to four-family properties. A significant percentage of the applications The Mortgage Firm generated during the Relevant Time Period came from the Miami MSA.

15.     The Mortgage Firm is subject to the FHA, ECOA, and their respective implementing regulations, 24 C.F.R. pt. 100 and Regulation B.

16.     The Mortgage Firm is a "creditor" within the meaning of ECOA, 15 U.S.C. § 1691a(e), and is engaged in "residential real estate-related transactions" under the FHA, 42 U.S.C. § 3605.

## FACTUAL ALLEGATIONS

### The Miami MSA

17.     The Miami MSA is the basis for the United States' allegations. The Miami MSA comprises three counties in Florida: Miami-Dade County, Broward County, and Palm Beach County, which correspond with three metropolitan divisions. The Mortgage Firm treated the entire MSA as its market area and did not differentiate this market area by county.

---

[4] During the Relevant Time Period, five of The Mortgage Firm's Miami MSA offices operated under the following names: Family Mortgage; Great Eastern Powered by The Mortgage Firm; Mortgage Professionals Powered by The Mortgage Firm; Priority Lending Powered by The Mortgage Firm; and Standard Mortgage Company Powered by The Mortgage Firm.

18.     As of 2019,[5] the total population of the Miami MSA was approximately 6.1 million, of which 20% of the residents identified themselves as Black (non-Hispanic); 45% as Hispanic; 30% as white (non-Hispanic); and 2% as Asian.

19.     The Miami MSA comprises 1,200 census tracts, of which 770 (64%) are majority-Black and Hispanic, and 369 (31%) are majority-white. Of the 770 majority-Black and Hispanic census tracts, 432 (36% of the 1,200 tracts in the MSA) are high-Black and Hispanic.

20.     These majority- and high-Black and Hispanic census tracts are concentrated in Miami-Dade County and Broward County. Of the 770 majority-Black and Hispanic census tracts in the Miami MSA, 466 (60.5%) are in Miami-Dade County, 206 (26.8%) are in Broward County, and 98 (12.7%) are in Palm Beach County. Of the 432 high-Black and Hispanic census tracts in the Miami MSA, 346 (80.1%) are in Miami-Dade County, 56 (13%) are in Broward County, and 30 (6.9%) are in Palm Beach County. *See* **Exhibit A.**

### The United States' Investigation

21.     On March 11, 2022, the Consumer Financial Protection Bureau made a referral to the Department of Justice after obtaining evidence that The Mortgage Firm has violated ECOA, 15 U.S.C. § 1691(a)(1), and Regulation B, 12 C.F.R. § 1002.4(b), "by intentionally redlining minority neighborhoods in the Miami MSA by engaging in acts or practices directed at prospective applicants that would discourage reasonable people on the basis of race or national origin from applying for credit."

22.     On May 31, 2022, the United States informed The Mortgage Firm that it had initiated an investigation into potential lending discrimination by The Mortgage Firm in violation of ECOA, 15 U.S.C. §§ 1691-1691f, and the FHA, 42 U.S.C. §§ 3601-3619.

---

[5] The demographic data discussed in this Complaint is based on the 2019 American Community Survey data from the United States Census Bureau.

**The Mortgage Firm Received Disproportionately Low Numbers of Residential Mortgage Applications from Majority- and High-Black and Hispanic Neighborhoods**

23.     Within the Miami MSA, The Mortgage Firm's pattern of lending during the Relevant Time Period demonstrates a focus on majority-white areas while disproportionately failing to serve majority- and high-Black and Hispanic neighborhoods, as compared to its peer lenders.

24.     The Mortgage Firm's policies and practices alleged herein—including the concentration of nearly all its offices, loan officers, marketing, and outreach in majority-white neighborhoods—have discriminated against applicants and prospective applicants in majority- and high-Black and Hispanic neighborhoods in the Miami MSA, including by discouraging them from applying for and ultimately obtaining its home loans.

25.     The Mortgage Firm's own data on loan applications and originations, that it is required to report to regulators under HMDA, 12 U.S.C. §§ 2801-2811, confirm that The Mortgage Firm avoided serving majority- and high-Black and Hispanic neighborhoods in the Miami MSA. *See* **Exhibits B and C.**

26.     From 2016 through 2021, The Mortgage Firm significantly underperformed its peer lenders in generating home mortgage applications from majority- and high-Black and Hispanic neighborhoods in the Miami MSA. The Mortgage Firm's peer lenders are financial institutions that received between 50 percent and 200 percent of The Mortgage Firm's annual volume of home mortgage loan applications.

27.     The disparity between the rate of applications generated by The Mortgage Firm and the rate generated by its peer lenders from majority- and high-Black and Hispanic neighborhoods in the Miami MSA is both statistically significant—meaning unlikely to be caused by chance—and sizable in every year from 2016 through 2021.

28.     Specifically, of the 9,375 HMDA-reportable mortgage applications The Mortgage Firm generated from 2016 through 2021 in the Miami MSA, only 2852, or 30.4 percent, came from residents of majority-Black and Hispanic neighborhoods. By contrast, during the same time period, The Mortgage Firm's peers generated 59 percent of their HMDA applications from these same majority-Black and Hispanic neighborhoods.

29.     The Mortgage Firm's application data reflects the near exact inverse of the demographic makeup of the Miami MSA, where 64 percent of the census tracts are majority-Black and Hispanic and 31 percent are majority-white, whereas, during the Relevant Time Period, about 63 percent of The Mortgage Firm's mortgage applications came from majority-white census tracts, and only 30.4 percent came from majority-Black and Hispanic census tracts.

30.     The disparity between The Mortgage Firm's lending and its peers' lending was even greater in high-Black and Hispanic neighborhoods. Only 523, or 5.6 percent of The Mortgage Firm's 9,375 HMDA-reportable mortgage applications came from high-Black and Hispanic areas. By contrast, during the same time period, The Mortgage Firm's peers generated 26.9 percent of their HMDA applications from these same high-Black and Hispanic neighborhoods.

31.     In other words, from 2016 through 2021, The Mortgage Firm's peer lenders generated applications from majority-Black and Hispanic areas at nearly twice the rate of The Mortgage Firm, and from high-Black and Hispanic areas at nearly five times the rate of The Mortgage Firm.

32.     The statistically significant disparities between applications The Mortgage Firm generated from majority- and high-Black and Hispanic neighborhoods and those that its peers generated show that there were significant numbers of residents in majority- and high-Black and

Hispanic areas in the Miami MSA who were seeking home mortgage loans. The Mortgage Firm had no legitimate, non-discriminatory reason to draw so few applications from these areas.

33.     The data show a statistically significant failure by The Mortgage Firm, relative to its peer lenders, to draw applications for home loans and provide residential mortgage services to residents in majority- and high-Black and Hispanic neighborhoods in the Miami MSA on a non-discriminatory basis from 2016 through 2021.

34.     During the Relevant Time Period, even when The Mortgage Firm generated applications from majority-Black and Hispanic areas in the Miami MSA, the applicants themselves were disproportionately white when compared to The Mortgage Firm's peers. For applications, The Mortgage Firm generated in majority-Black and Hispanic census tracts, on average, 42 percent of the applications came from white applicants. By contrast, during the same time period, when The Mortgage Firm's peers generated applications from majority-Black and Hispanic areas, on average, only 19 percent of the applications came from white applicants.

**The Mortgage Firm Made Disproportionately Low Numbers of Home Loans to Applicants in Majority- and High-Black and Hispanic Neighborhoods**

35.     The Mortgage Firm's lending practices have discriminated against, including by discouraging, applicants and prospective applicants in majority- and high-Black and Hispanic neighborhoods in the Miami MSA from seeking home loans. As a result, The Mortgage Firm made a significantly smaller percentage of HMDA-reportable residential mortgage loans in these neighborhoods as compared to its peers from 2016 through 2021. *See* **Exhibit C**.

36.     The disparity between the rate of home loans that The Mortgage Firm made, and the rate made by its peer lenders, in majority- and high-Black and Hispanic neighborhoods was both statistically significant and sizable in every year analyzed.

37.     Specifically, of the 7,400 HMDA-reportable residential mortgage loans The Mortgage Firm made from 2016 through 2021 in the Miami MSA, 2,194, or 29.6 percent, were to residents of majority-Black and Hispanic areas. By contrast, The Mortgage Firm's peers made 56.9 percent of their HMDA loans to these same majority-Black and Hispanic neighborhoods.

38.     The disparity was even greater in high-Black and Hispanic neighborhoods. Only 388, or 5.2 percent of The Mortgage Firm's 7,400 HMDA-reportable residential mortgage loans made from 2016 through 2021 were to residents of high-Black and Hispanic areas. By contrast, during the same time period, The Mortgage Firm's peers made 25.2 percent of their HMDA loans to these same high-Black and Hispanic neighborhoods.

39.     In other words, from 2016 through 2021, The Mortgage Firm's peer lenders made home loans in majority-Black and Hispanic areas at almost twice the rate of The Mortgage Firm, and nearly five times the rate of The Mortgage Firm in high-Black and Hispanic areas.

40.     The level of lending by The Mortgage Firm's peers demonstrates that there were significant numbers of qualified borrowers for home loans and sufficient mortgage loan demand in majority- and high-Black and Hispanic neighborhoods in the Miami MSA. The Mortgage Firm had no legitimate, non-discriminatory reason to originate so few loans from these areas.

41.     The data show a statistically significant failure by The Mortgage Firm to make home loans and provide residential mortgage services to qualified applicants in majority- and high-Black and Hispanic neighborhoods on a non-discriminatory basis when compared with similarly situated lenders from 2016 through 2021.

**The Mortgage Firm's Offices Were Predominantly Located in Majority-White Areas**

42.     From 2016 through 2021, The Mortgage Firm's offices in the Miami MSA were located to serve the credit needs of residents in majority-white neighborhoods and to avoid serving the credit needs of residents in majority- and high-Black and Hispanic neighborhoods.

43.     At various times during the six-year Relevant Time Period, The Mortgage Firm operated 14 offices in the Miami MSA. *See* **Exhibit A**. Nine of these offices were open for most, or all, of the Relevant Time Period, and five of these offices were open for anywhere between two weeks and seven months of the Relevant Time Period. All of these office locations could accept mortgage loan inquiries from prospective applicants and all were listed on The Mortgage Firm's website.

44.     Of the nine offices open for most, or all, of the Relevant Time Period, the overwhelming majority—eight offices—were located in majority-white neighborhoods. Although 64% of the census tracts in the Miami MSA are majority-Black and Hispanic, only one of the nine offices was located in a majority-Black and Hispanic neighborhood, and it was surrounded by majority-white neighborhoods.

45.     Of the five offices open briefly during the Relevant Time Period, two were located in majority-white neighborhoods, one was located in a majority-Black and Hispanic neighborhood and two were located in high-Black and Hispanic neighborhoods. These offices were only open for a few months and received only a small number of mortgage applications.

46.     By concentrating nearly all its offices in majority-white areas, The Mortgage Firm discriminated against, including by discouraging, residents of majority- and high-Black and Hispanic areas from applying for and obtaining mortgage loans from The Mortgage Firm and restricted their access to credit.

47.     Further, from at least 2016 through 2021, The Mortgage Firm failed to take actions that would compensate for its lack of a meaningful office presence in majority- or high-Black and Hispanic areas.

### The Mortgage Firm Failed to Ensure that its Loan Officers Served
### Majority- and High-Black and Hispanic Communities

48.     From at least 2016 through 2021, The Mortgage Firm's loan officers served the credit needs of majority-white neighborhoods but did not serve the credit needs of majority- and high-Black and Hispanic neighborhoods in the Miami MSA.

49.     The Mortgage Firm relied primarily on its loan officers to generate residential mortgage loan applications and cultivate relationships to serve the credit needs of residents in the Miami MSA.

50.     During the Relevant Time Period, The Mortgage Firm assigned all of its loan officers to its office locations, which, as noted above, are largely located in or near majority-white areas.

51.     The Mortgage Firm did not direct, train, or incentivize its loan officers or other staff to take steps to compensate for its lack of a physical presence in majority- or high-Black and Hispanic areas or to otherwise serve the credit needs of these communities. The Mortgage Firm's loan officers generally worked with prospective clients within the area surrounding each loan officer's assigned office location, and The Mortgage Firm did not direct loan officers to generate loans in areas of the Miami MSA outside the region surrounding the loan officer's assigned office.

52.     According to The Mortgage Firm, from 2016 through 2021, the Firm employed 46 mortgage loan officers in the Miami MSA. None of these 46 loan officers were Black, despite that 20% of the population of the Miami MSA identifies as Black.

53.     Fifteen of the 46 loan officers employed during the Relevant Time Period were Hispanic. But, of these fifteen Hispanic loan officers, only four remained employed at The Mortgage Firm for at least one year, despite that 45% of the population of the Miami MSA identifies as Hispanic.

54.     By contrast, from 2016 through 2021, 30 of The Mortgage Firm's 31 non-Hispanic white loan officers remained employed at The Mortgage Firm for over one year.

55.     During the Relevant Time Period, The Mortgage Firm advertised the identities of its loan officers, who were mostly non-Hispanic white, on its website.

56.     The advertising of mostly white loan officers on The Mortgage Firm's website discriminated against, including by discouraging, residents of majority- and high-Black and Hispanic neighborhoods, or those seeking credit in those neighborhoods, from seeking credit from The Mortgage Firm in the Miami MSA.

57.     The Mortgage Firm established new offices and hired new loan officers based on their preexisting and potential books of business. During the Relevant Time Period, The Mortgage Firm's loan officers were experienced with serving, and had ties to, majority-white areas. The Mortgage Firm did not make efforts to hire loan officers experienced with serving, or with ties to, majority- or high-Black and Hispanic areas of the Miami MSA. The Mortgage Firm maintained no formal policies or procedures for recruiting new loan officers.

### The Mortgage Firm's Marketing Targeted Majority-White Neighborhoods and Avoided Majority- and High-Black and Hispanic Neighborhoods

58.     From 2016 through 2021, The Mortgage Firm's primary method of marketing was through the relationships its loan officers formed with referral partners. The Mortgage Firm relied almost entirely on loan officers to develop referral sources, conduct outreach to potential customers, and distribute marketing materials related to The Mortgage Firm's mortgage lending services.

59.     In the Miami MSA, those referral networks were heavily weighted toward The Mortgage Firm's Jupiter office, in Palm Beach County, which is located in, and surrounded by, majority-white census tracts. The Jupiter office location is farther from a majority-Black and

Hispanic census tract in the Miami MSA than any other office of The Mortgage Firm in the MSA.

60.    During the Relevant Time Period, The Mortgage Firm's management exercised minimal or no oversight into the creation or maintenance of referral networks.

61.    The Mortgage Firm did not make notable efforts to develop referral networks in, or market to residents of, majority- or high-Black and Hispanic neighborhoods. For example, it did not train or incentivize its loan officers to market, advertise, or develop referral partnerships in majority- or high-Black and Hispanic neighborhoods during the Relevant Time Period.

62.    In fact, The Mortgage Firm neither monitored nor documented where or to whom its loan officers distributed marketing materials of its mortgage lending services to ensure that such distribution reached all neighborhoods throughout the Miami MSA.

63.    Despite the fact that The Mortgage Firm operates in an MSA where 45% of the population is Hispanic, The Mortgage Firm conducted minimal or no meaningful outreach or marketing to Hispanic communities during the Relevant Time Period.

64.    Similarly, The Mortgage Firm did not translate its website into Spanish or indicate on its website which offices could assist Spanish-speaking clients.

65.    The Mortgage Firm knew that its referral partners typically did not refer Spanish speaking customers to The Mortgage Firm and would likely refer Spanish speakers to other lenders but failed to take steps to solicit these referrals or to otherwise serve Spanish-speaking customers.

66.    During the Relevant Time Period, stock images on The Mortgage Firm's website did not feature diverse models. The Mortgage Firm's website home page prominently featured a couple who appeared to be non-Hispanic white, and not any individuals who appeared to be other races, colors, or ethnicities. On other website pages, families who appeared to be non-Hispanic white were featured more frequently and more prominently than diverse families.

67.     The Mortgage Firm's failure to conduct outreach or market to majority- and high-Black and Hispanic areas, and failure to take any meaningful efforts to compensate for its lack of referral partners in majority-Black and Hispanic neighborhoods, discriminated against, including by discouraging, prospective applicants from seeking credit with The Mortgage Firm and was intended to deny, and had the effect of denying, equal access to home loans for those residing in, or seeking credit for properties located in, majority- and high-Black and Hispanic neighborhoods in the Miami MSA.

### The Mortgage Firm's Employees Exchanged Emails Indicating Racial Bias and Discrimination

68.     From at least 2018 through 2019, The Mortgage Firm's employees sent and received emails that indicate potential racial bias, disparagement of communities of color, and/or an intent to discriminate. These emails included statements implying a reticence to provide lending services to, or work with borrowers in, majority- and high-Black and Hispanic neighborhoods.

69.     In at least three instances, loan officers of The Mortgage Firm made derogatory references to majority-Black and Hispanic neighborhoods as "ghetto" or in the "hood":

   a.   In an email exchange between a non-Hispanic white loan officer from The Mortgage Firm and an outside title agent, the agent sent the loan officer a real estate listing for a duplex in West Palm Beach, which is a predominantly Black and Hispanic area. The loan officer responded with, "Ghetto?"

   b.   The same loan officer from The Mortgage Firm wrote to the same title agent regarding an event at a golf entertainment venue in a majority-white area, "Was thinking that for team event. . . these Jupiter realtors don't want to go to the HOOD;-)."

   c.   In an exchange between a non-Hispanic white loan officer and a non-Hispanic

white regional sales manager, both from The Mortgage Firm, regarding a comparable property used for an appraisal in Broward County, the loan officer wrote, "I lived in Hollywood for over 20 years. This comparable is in the hood side of town. My home closed in March for 680k and is a block away from [the property in question.] [V]alue is there just need a different appraiser."

70. The loan officer who exchanged the first two sets of emails still works at The Mortgage Firm, but the loan officer was not disciplined in a timely or meaningful manner. The Mortgage Firm gave this loan officer only a written warning for these emails over nine months after the emails were brought to The Mortgage Firm's attention. The employees who exchanged the third set of emails no longer worked at The Mortgage Firm at the time the emails were brought to The Mortgage Firm's attention.

71. On at least two occasions, a non-Hispanic white loan officer from The Mortgage Firm sent emails containing the n-word:

   a. In an email from the loan officer to an outside vendor to create banners, the loan officer wrote, "Working on it now ma n***a."

   b. The same loan officer emailed the same vendor with "Signs for your favorite N****r." The vendor responded, "Send me content and electronic file of your logo my n***a."

72. The Mortgage Firm did not discipline this loan officer, who was among the highest-producing loan officers in the Miami MSA, in a timely or meaningful manner. He was given only a written warning for these emails over nine months after the emails were brought to The Mortgage Firm's attention.

**The Mortgage Firm Did Not Adequately Monitor Redlining Risk or
Enforce Fair Lending Training Requirements**

73.     During the Relevant Time Period, The Mortgage Firm's Compliance Department lacked adequate internal fair lending policies and procedures, and thus failed to ensure that The Mortgage Firm provided equal access to credit to majority- and high-Black and Hispanic areas of the Miami MSA.

74.     Before 2020, The Mortgage Firm did not conduct fair lending assessments to identify redlining risk and did not regularly evaluate its compliance with the FHA or ECOA.

75.     The Mortgage Firm did not analyze its mortgage lending data until mid-2020, after the Consumer Financial Protection Bureau notified The Mortgage Firm that it would conduct a fair lending examination, and did not begin to address redlining risk in the Miami MSA until after the Consumer Financial Protection Bureau informed The Mortgage Firm that it found evidence of redlining.

76.     While The Mortgage Firm purported to provide fair lending training for its employees engaged in mortgage lending, The Mortgage Firm did not enforce any fair lending training requirements or take other steps to ensure its employees were knowledgeable about and complying with The Mortgage Firm's fair lending responsibilities under the FHA and ECOA.

**COUNT I: VIOLATIONS OF THE FAIR HOUSING ACT**

77.     The United States incorporates all prior Paragraphs of the Complaint as if fully set forth herein.

78.     The Mortgage Firm's policies and practices constitute the unlawful redlining of majority- and high-Black and Hispanic communities in the Miami MSA on account of the racial, color, and national origin composition of those communities. The Mortgage Firm's policies and practices were intended to deny, and had the effect of denying, equal access to home loans to

16

residents of majority- and high-Black and Hispanic communities and those seeking credit for properties located in those communities. The Mortgage Firm's conduct was not justified by business necessity or legitimate business considerations.

79.     The Mortgage Firm's actions as alleged herein constitute:

a.   Discrimination on the basis of race, color, and national origin in making available residential real estate-related transactions, or in the terms or conditions of residential real estate-related transactions, in violation of the Fair Housing Act, 42 U.S.C. § 3605(a), and its implementing regulation, 24 C.F.R. §§ 100.110(b), 100.120;

b.   The making unavailable or denial of dwellings to persons because of race, color, and national origin, in violation of the Fair Housing Act, 42 U.S.C. § 3604(a), and its implementing regulation, 24 C.F.R. § 100.50(b)(3); and

c.   Discrimination on the basis of race, color, and national origin in the terms, conditions, or privileges of the sale or rental of dwellings, or the provision of services or facilities in connection with the sale or rental of dwellings, in violation of the Fair Housing Act, 42 U.S.C. § 3604(b), and its implementing regulation, 24 C.F.R. §§ 100.50(b)(2), 100.65.

80.     The Mortgage Firm's policies and practices as alleged herein constitute, in violation of 42 U.S.C. § 3614(a):

a.   A pattern or practice of resistance to the full enjoyment of rights secured by the Fair Housing Act; and

b.   A denial of rights granted by the Fair Housing Act to a group of persons that raises an issue of general importance.

81.     The Mortgage Firm's pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

82.     Persons who have been victims of The Mortgage Firm's discriminatory policies and practices are "aggrieved" as defined in 42 U.S.C. § 3602(i), and may have suffered damages as a result of The Mortgage Firm's conduct in violation of the Fair Housing Act, as described above.

**COUNT II: VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT**

83.     The United States incorporates all prior paragraphs of the Complaint as if fully set forth herein.

84.     The Mortgage Firm's acts, policies, and practices as alleged herein constitute unlawful discrimination, including by redlining majority- and high-Black and Hispanic communities in the Miami MSA and engaging in acts and practices directed at applicants and prospective applicants that would discourage a reasonable person from applying for credit on the basis of race, color, or national origin in violation of ECOA and Regulation B. 15 U.S.C. § 1691 et seq.; 12 C.F.R. § 1002.4 (b).

85.     The Mortgage Firm's policies and practices as alleged herein constitute a pattern or practice of discrimination and resistance to the full enjoyment of rights secured by the Equal Credit Opportunity Act, in violation of ECOA. 15 U.S.C. § 1691e(h).

86.     The Mortgage Firm's pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

87.     Persons who have been victims of The Mortgage Firm's discriminatory policies

and practices are aggrieved  and may have suffered damages as a result of The Mortgage Firm's conduct in violation of the Equal Credit Opportunity Act, as described above.

**REQUEST FOR RELIEF**

The United States requests that the Court enter an order that:

(1)     Declares that the conduct of Defendant The Mortgage Firm violates the Fair Housing Act;

(2)     Declares that the conduct of Defendant The Mortgage Firm violates the Equal Credit Opportunity Act;

(3)     Enjoins Defendant The Mortgage Firm, its agents, employees, successors, and all others in active concert or participation with The Mortgage Firm, from:

   A.   Discriminating on account of race, color, or national origin in any aspect of their lending business practices;

   B.   Discouraging applicants or prospective applicants on account of race, color, or national origin;

   C.   Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of Defendant's unlawful practices to the position they would be in but for the discriminatory conduct; and

   D.   Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of Defendant's unlawful practices, and providing policies and procedures to ensure all segments of Defendant's market areas are served without regard to prohibited characteristics;

(4)     Awards damages, restitution, equitable, and other monetary relief against Defendant under 42 U.S.C. § 3614(d)(1)(B); and 15 U.S.C. §§ 1691c(a)(9), 1691e(h);

(5)     Assesses a civil penalty against Defendant in an amount authorized by 42 U.S.C. § 3614(d)(1)(C); and

(6)     Awards Plaintiff any additional relief the interests of justice may require.

## DEMAND FOR JURY TRIAL

The United States demands trial by jury in this action on all issues so triable.

Respectfully submitted this 7th day of January, 2025.

**FOR THE UNITED STATES OF AMERICA:**

MERRICK B. GARLAND
Attorney General

MARKENZY LAPOINTE
United States Attorney
Southern District of Florida

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

CARRIE PAGNUCCO
Chief

JENNIFER A. SLAGLE PECK
Deputy Chief

*/s/ Veronica Harrell-James*
VERONICA HARRELL-JAMES
Assistant United States Attorney
101 South U.S. 1, Suite 3100
Fort Pierce, Florida 34950
Phone: (772) 293-0982
Veronica.Harrell-James@usdoj.gov

CHANTEL DOAKES SHELTON
Assistant United States Attorney
500 E. Broward Blvd.
Ft. Lauderdale, Fl. 33394
Phone: (954) 356-7255
Chantel.DoakesShelton@usdoj.gov

*/s/ Ameya S. Ananth*
AMEYA S. ANANTH
ELISE S. SHORE
Trial Attorneys
Housing & Civil Enforcement Section
950 Pennsylvania Ave. NW – 4CON
Washington, DC 20530
Phone: (202) 514-4713
Fax: (202) 514-1116
Ameya.Ananth@usdoj.gov
Elise.Shore@usdoj.gov